Alice D. Worcester v. Commissioner.
Worcester v. Commissioner
Docket Nos. 90353, 92184.
United States Tax Court
T.C. Memo 1962-212; 1962 Tax Ct. Memo LEXIS 97; 21 T.C.M. (CCH) 1138; T.C.M. (RIA) 62212; September 7, 1962
*97 Vincent L. Hennessy, Esq., 60 State St., Boston, Mass., for the petitioner. Robert B. Dugan, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in income tax in these consolidated cases as follows: Docket No.
Year
Deficiency
90353
1955
$1,675.30
90353
1956
9,220.18
90353
1957
6,407.24
92184
1958
8,057.31 The issues remaining for decision are (1) whether losses incurred in the operation of a farm are deductible from gross income under the Internal Revenue Code of 1954 and, if so, (2) whether petitioner has established the amount of these losses. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner was born on May 19, 1879, and filed her income tax returns for the taxable years 1955, 1956, 1957, and 1958 with the district director of internal revenue for the district of Massachusetts. At all times material hereto, petitioner kept her accounts and filed her Federal income tax returns on the cash basis and her taxable year was the calendar year. In 1936, petitioner's husband, Henry E. Worcester (hereinafter called decedent), purchased *98 real property located in Francistown, New Hampshire, known as Bible Hill Farm (hereinafter called the farm). Prior to his death in April 1954, decedent had maintained the farm for his pleasure only and operational expenses were never deducted on decedent's and petitioner's joint tax returns. At the time of his death and for some years prior thereto, decedent had hired a married couple to live on the farm and maintain it in operation. During this period there were a few cows and chickens on the farm and some vegetables were raised. No sheep had been raised on the farm by decedent. Upon the death of her husband, petitioner inherited the farm, among other substantial assets. The farm consisted of approximately 445 1/2 acres, of which about 75 were cleared. There were three houses, a barn, several smaller buildings, and farm equipment on the farm. Two of the houses were in good condition. The third house, known as the Jelly house, was in poor condition and did not have electricity or a bath. After the death of her husband, petitioner postponed any final decision with respect to the farm and continued to hold it for one year. During the following winter, petitioner thought it best to *99 sell the farm since it was costing too much money to retain. Henry W. von Rosenvinge (hereinafter called Henry), the grandson of petitioner, was born on September 20, 1935, and was married on July 9, 1955. He granduated from Deerfield Academy in 1955, having taken a college preparatory course. During his senior year at Deerfield, Henry decided not to go to college. During the latter part of 1954, or early in 1955, Henry approached petitioner with regard to operating the farm commercially. Henry had previously worked on the farm during summers but was not experienced in running a farm. Petitioner decided to let him try and see what he could do. Petitioner had income from investments of $22,088.37 in 1955, $41,181.31 in 1956, $34,022.84 in 1957, and $57,306.39 in 1958. No additional income was required to meet the needs of petitioner and a farming venture would not have been undertaken if a source of additional income was required. On the recommendation of petitioner's son, Henry E. Worcester (hereinafter called Worcester), a preliminary report was secured on the potential of the farm as a commercial venture from the Doane Agricultural Service, Inc. Worcester, a graduate of Massachusetts *100 Institute of Technology and the owner of a laundry and dry cleaning business, had operated his own dairy farm with the help of a tenant farmer. He advised petitioner at that time that it would be difficult to establish a profitable operation at the farm. The Doane report, recognizing that "[a] preference was indicated for a pure bred beef and calf herd livestock operation," analyzed the agricultural and financial aspects of this type of operation on the farm. The report stated in part: It is recommended that a beef cow and calf herd be established on this farm and after full development the land should be satisfactory to handle 40 beef cows, 5 replacement heifers, and 2 bulls. On the basis of this program, the report estimated a "net profit" of $241 and an "estimated long time capital expense budget" of $20,100 and came to the following conclusion: Conclusion: Unless additional land can be acquired or more land cleared than is estimated in this report, the above livestock program will not furnish suitable income to cover depreciation, interest on investment, and net profit to the owner. Recommendation: That the owner investigate the possibilities of more additional land *101 in the area or make a thorough survey of the available land to be cleared so that enough land can be acquired to handle between 50 and 60 beef cows. * * *
It is our opinion that the only possible way to increase the net income to the owner would be by clearing more land and adding another ten or twenty beef cows without increasing the annual expense to any great extent. * * *
After reviewing the possibilities, we feel that this property will prove to be a liability if handled as a farming operation. The chances of it ever showing a profit are very remote and therefore, we can not recommend that the owner proceed with the property as a farm. Should it be possible to rent the land and/or buildings, we would strongly advise it and feel that a greater return would be realized. After studying the Doane report, Henry consulted with many people concerning several different types of operations to determine the most suitable operation. Frederick H. Norton, a professor of ceramics and a close friend of the family, who had 15 years' experience in raising a small flock of sheep, advised Henry that a long-range sheep raising project on the farm should be profitable. Doane Agricultural *102 Service, a professor of sheep husbandry at the University of New Hampshire, and the headmaster of the Deerfield Academy were also consulted. Petitioner decided to allow Henry to try to establish a sheep farm on the property. This type of operation was considered the best opportunity for making a financial success of the farm. No written agreement was entered into at that time. Petitioner agreed to pay all the expenses and to pay Henry $50 a month. On August 1, 1955, Henry and his wife moved onto the farm and began its operation. Henry used the Doane report as a foundation for the plan of operation and consulted with several local farmers for help in the purchasing and slaughtering of sheep. During the next two years, Henry and two full-time employees did considerable work in adapting the farm to the sheep operation, repairing buildings, clearing land, planting and harvesting crops, building the breeding flock, and restoring the farm to productive condition. Henry began to purchase the necessary equipment and petitioner paid the bills. Henry devoted full time to the operation of the farm. A checking account for the farm was established with the First National Bank of Peterborough, *103 New Hampshire, and, after 1955, amounts for expenses not connected with capital outlay were drawn from that account by Henry. At the end of each month these figures of expense were placed on a costing sheet. The records were sent to the care of the Second Bank State Street Trust, now the State Street Bank. During the years of operation, Henry used his entire inheritance from decedent's estate to purchase farm equipment which petitioner did not pay for. During the winter of 1956-1957, petitioner became concerned about the expenses of the farm and consulted Worcester about determining whether the farm could be financially successful as originally intended. Worcester recommended that the Doane Service be again contacted with specific reference to a sheep operation and inquiry be made as to the cost of establishing a plan of development. On July 26, 1957, Rush C. Gwyn of the Doane Service wrote to Henry in part as follows: After due consideration of improvements, progress, investment, and future operation, I would consider it unwise to discontinue the operation which you now have on your farm. After a second letter from Gwyn dated August 23, 1957, Worcester wrote to Doane on September 6, 1957, requesting *104 the following: 1. What are the potentials of the farm as a sheep raising farm? 2. Can it be expected to make a reasonable return on the investment? How much? 3. What additional investment will be required both in capital expenditure and in operating costs before it will carry itself and start making a profit? 4. What can you do to help advise and develop procedures to assure this success? Mrs. Worcester does not have unlimited funds to use for the development of this farm but is willing to put up additional funds, within limits, if she can be shown reasonable hopes that the enterprise should become a profitable financial proposition. On October 22, 1957, Gwyn advised petitioner Henry, and Worcester to pay Henry " $175 per month instead of his present $600 per year salary and personal food bill." This was promptly acted upon by the parties. In addition, Gwyn submitted the following analysis of estimated sales, operational costs, and capital investment necessary for full development: "ACTUAL & ESTIMATED SALES & OPERATIONAL COSTS TO
FULL DEVELOPMENT, BASED ON CURRENT PRICES
Actual
Estimated
Estimated
Estimated
Estimated
October
October
October
October
October
'56-'57
'57-'58
'58-'59
'59-'60
'60-'61
Sales
$ 4,800
$13,975
$16,820
$21,270
$21,725
Operational Costs
14,405
17,385
18,035
19,225
16,625
Additional Operational
9,605
3,410
1,215
Expenses
Gross Profit after
2,045
5,100
October, 1960
*105 ESTIMATED CAPITAL INVESTMENT FOR FULL DEVELOPMENT FROM
OCTOBER, 1957 TO OCTOBER, 1961 BASED ON CURRENT PRICES
Clearing and placing into production 93 A. (a) $75/A.
$ 7,000
Barn
9,000
Feed Bunkers
3,000
Finish machine shed
2,000
Used truck - power body
3,500
Fencing
3,000
Silo
2,000
Hay conditioner
800
Grain Drill
650
Sheep - 400(a) $25
10,000
TOTAL
$40,950"
The operational costs were estimated on the basis of Henry receiving $175 per month and did not include the cost of quarterly or semi-annual on-the-farm visits by Doane Service at an expected cost of $400 per trip. A farm manager's salary normally exceeds $5,000 per year. An arrangement was made whereby the farm operation would be continued for the period of one year, during which time monthly reports beginning October 1957 would be made to Worcester. On the basis of operations during this year, a final decision would be made as to whether the farm would be continued or not. The monthly reports were made and were continued until the operation was terminated. During this period, Gwyn, the representative from the Doane Service, made periodic visits to the farm and stated to Worcester *106 that he felt the farm could become a profitable investment. In June 1958, Henry received definite word from his draft board that he would soon be inducted into the Army. In July 1958, he failed to pass his pre-induction physical examination. During this time, Henry and Worcester discussed the operation of the farm and came to the decision that petitioner should discontinue the sheep operation. The farm operation was discontinued in July 1958. In January 1959, Henry passed a second physical examination and was inducted in February 1959. Petitioner, as had been her custom while her husband was alive, spent some weekends on the farm and visited for a period of weeks during the summer. When she came up, she stayed in the yellow house, which was kept for her and was separate from the farming operation. She cooked her own food while she was there and paid for her own expenses separate from the farm operation. An item of maintenance connected with the yellow house which might have been included in the expenses of the farm was fuel. The house was heated only when she came up and the water was shut off when she left so that the pipes would not freeze. The furnace burned coal until 1957, *107 when it was converted to oil. Gross farm income, farm expenses, deductions, and losses claimed by petitioner in her tax returns and amounts substantiated for the taxable years 1955 through 1958 were as follows: Claimed on Tax Return
Farm deduc-
Amount
Gross
tions
substantiated
(including
Year
farm
Farm
depreciation)
Loss
income
expenses
8/1/55-12/31/55
$
$ 5,142.07
$ 5,142.07
$ 5,142.07
4,466.34
1/1/56-12/31/56
$3,894.98
21,847.59
24,488.25
20,593.27
22,673.81
1/1/57-12/31/57
5,527.84
22,316.83
26,395.07
20,867.23
24,691.48
1/1/58- 6/30/58
1,638.62
12,896.03
17,663.63
16,025.01
16,560.50
The capital invested in the farm during the taxable years 1955 through 1958 was as follows: Petitioner's
Henry's
Aggregate
capital
capital
capital
investment *
investment
investment
Year
Amount **
Year
Amount
1955
$32,291.23
1955
$32,291.23
1956
9,750.89
1956
42,042.12
1957
13,784.22
1957
55,826.34
1958
662.90
1958
56,489.24
$8,117.00
64,606.24
*108 Respondent, in his deficiency notice, disallowed the deduction of the losses incurred in the operation of the farm in 1955, 1956, 1957, and 1958. Petitioner operated the farm primarily for profit and intended to keep whatever net profits were realized. The following are the gross farm income; the deductions including depreciation and taxes allowable as incurred in a transaction entered into for profit; and the net loss from the farm operation deductible from adjusted gross income: Gross farm
Year
income
Deductions
Net loss
1955
$ 4,100.00
$ 4,100.00
1956
$3,894.98
18,125.00
14,230.02
1957
5,527.84
19,750.00
14,222.16
1958
1,638.62
13,250.00
11,611.38
Opinion This is not at all similar to the numerous situations where a taxpayer voluntarily enters upon a venture, the characteristics of which unmistakably show that the transaction was not engaged in for profit. Cf., e.g., , affirmed per curiam (C.A. 6, 1955), certiorari denied ; affd. (C.A. 2, 1962). Petitioner *109 had no choice in the acquisition of the farm. And we think a different criterion must be employed where, as in the case of an inheritance, a choice of dispositions of the property is forced upon the taxpayer. ; ; . Petitioner, whose testimony was obviously entitled to full credibility, makes it clear that she originally intended to attempt to sell the property; although, dealing as she was with a purely residential estate of over 400 acres with no record of profitable use, it may be questioned how simple or successful an expedient this might have been. When an opportunity, even though perhaps doubtful, arose to attempt to create a working farm, it was not unbusinesslike for her to take advantage of a fortunate accident. Although the prospective farm manager was her grandson, his willingness to undertake this experiment for so little compensation makes it reasonable to assume that she would have been well advised to enter upon a similar arrangement with a stranger [1] in the unlikely event that a proposition of that kind became available *110 to her. Her insistence upon the ultimate financial success of the enterprise is amply demonstrated. Not only did she testify that * * * I understood that they were going to try and make it a success. I didn't expect to go on the rest of my life if it wasn't successful. * * * I would say that I would naturally terminate it if it wasn't successful, if it was losing money * * * but her conduct throughout, and that of her advisers, shows that she was intent upon an operation that would offer the greatest prospect of success; the first concept having been condemned as impractical by a professional survey, further explorations found by the same professional source to be potentially fruitful were undertaken. Her own additional capital investment, of no personal benefit to her, coupled with the not inconsiderable contributions of her grandson, seem to us to indicate that there was a real purpose to transform the property into a financially successful undertaking. And when, after a trial period *111 of not excessive length, [2] it appeared that the forecasts were overoptimistic, the decision was in fact made to close down the farm operation. We have accordingly found as a fact that petitioner's primary purpose [3] was financial profit. In a case of this kind, where the facts are determinative, (C.A. 2, 1949), affirming a Memorandum Opinion of this Court, certiorari denied , this disposes of the major issue. *112 It cannot be overlooked, however, that not all the expenses claimed were established by the evidence. Moreover, some undisclosed portion of the expenses were of a personal nature. Petitioner did on occasion use the property as her residence and testified that she visited it in the same way after her husband's death as before. We think an allocation of the total cost of upkeep must be attributed to that aspect of its purpose. . There being no figures in the record from which this may be done accurately, we have made the best estimate possible, (C.A. 2, 1930), of the portion of the expense to be considered not deductible, bearing in mind that such items as taxes are a deduction in any event. These amounts appear in our findings. With that exception, the deficiency is disapproved. Decisions will be entered under Rule 50. Footnotes
*. Including certain farm property inherited by petitioner. ↩
**. As shown by the depreciation schedules in petitioner's tax returns for the years in question.↩
1. Respondent, for example, says in his reply brief: "[In] fact, the petitioner's expenses would have been even greater if she had entered into an arm's length commercial transaction * * *"↩
2. Internal Revenue Code of 1954. SEC. 270. LIMITATION ON DEDUCTIONS ALLOWABLE TO INDIVIDUALS IN CERTAIN CASES. (a) Recomputation of Taxable Income. - If the deductions * * * attributable to a trade or business carried on * * * for 5 consecutive taxable years have, in each of such years * * * exceeded by more than $50,000 the gross income derived from such trade or business, * * * such deductions shall be allowed only to the extent of $50,000 plus the gross income attributable to such trade or business, * * *↩
3. "Not only must the earning of profit be the taxpayer's motive or intent but, in addition, that motive must be the primary purpose for engaging in the transaction * * *." , affd. (C.A. 2, 1954). (Italics added.)↩